UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LILAC GROUP-W SCRANTON CORP.,

                                        Plaintiff,

        -v-

WELLS FARGO BANK, NA,

                                        Defendant.

No. 15-CV-9313 (KMK)

OPINION & ORDER

<u>Appearances:</u>

Gardiner S. Barone, Esq.
Blustein, Shapiro, Rich & Barone, LLP
Goshen, NY
*Counsel for Plaintiff*

Emma M. Kline, Esq.
Julie D. Goldstein, Esq.
Fox Rothschild
Warrington, PA
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Plaintiff Lilac Group-W Scranton Corp. ("Plaintiff") brings this Action against Wells

Fargo Bank, NA ("Wells Fargo"), alleging that Wells Fargo breached a lease agreement

pertaining to certain real property located in Scranton, Pennsylvania, by failing to pay rent

pursuant to the terms of the lease agreement.  (*See generally* Compl. (Dkt. No. 1).)  Before the

Court is Wells Fargo's Motion To Dismiss the Complaint pursuant to Federal Rule of Civil

Procedure 12(b)(6), or, in the alternative, To Transfer the Action to the Middle District of

Pennsylvania pursuant to 28 U.S.C. § 1404(a) (the "Motion").  (Dkt. No. 18.)  For the reasons

stated below, the Motion is denied.

I.  Background

A.  Factual Background

The following facts are drawn from Plaintiff's Complaint and the documents appended thereto, and are taken as true for the purpose of resolving the Motion.

In May 2004, Wachovia Bank, N.A. ("Wachovia"), and First States Investors 3300, LLC ("FSI"), entered into an Agreement of Sale and Purchase, setting forth a sale-leaseback transaction involving a portfolio of 147 properties that were originally owned by Wachovia. (Compl. ¶ 16.)  At the time of the sale, Wachovia was using the properties as a part of its banking operations.  (*Id.* ¶ 17.)  The sale-leaseback transaction occurred on September 22, 2004, when Wachovia conveyed to FSI 147 properties, and then those same properties were leased back to Wachovia by FSI.  (*Id.* ¶ 18.)

To memorialize the transaction, FSI and Wachovia executed a Master Agreement and separate leases (the "Leases") for each of the properties conveyed to FSI and then leased back to Wachovia.  (*Id.* ¶ 24.)  The Master Agreement was intended to set forth additional covenants and agreements with respect to the underlying Leases.  (*Id.*)  The Master Agreement explains:

> This Master Agreement is also being executed pursuant to the Purchase Agreement at the closing thereunder.  The purpose hereof is to set forth additional covenants and agreements with respect to the Leases between Master Landlord . . . , on the one hand, and Wachovia, on the other.  Generally, it is the intention of the parties to set forth such additional covenants and agreements in this Master Agreement, as opposed to setting forth the same in each of the Leases, due to (i) the application thereof to more than a single Lease Property, and/or (ii) the fact that the same are not intended to apply to any third party (i.e., unaffiliated) successors to the Master Landlord and/or Tenant under the Leases, except as provided in this Master Agreement; but this sentence is intended as explanatory and shall not be deemed to limit the express provisions hereof.

(*Id.* Ex. B, at Background ¶ C ("Master Agreement") (italics omitted).)  The Master agreement defined "Master Landlord" as:

(i) Master Landlord Named Herein, (ii) the person that shall succeed to the interest of Master Landlord hereunder upon the Enforcement Completion Date pursuant to Section 13.3 hereof, or (iii) following such a succession under Section 13.3 hereof, any person that shall thereafter acquire the interest of Master Landlord hereunder pursuant to an assignment permitted under Section 13.4 hereof.

(Master Agreement § 1.)  FSI was designated as the "Master Landlord Named Herein."  (*Id.*

Preamble.)  "Wachovia," as used in the Master Agreement, was defined as:

(i) Wachovia Bank, N.A., or (ii) a person constituting an immediate or remote successor to Wachovia Bank, N.A. by virtue of one or more mergers, consolidations and/or transfers of all, or substantially all, the assets of Wachovia Bank, N.A. (or another person described in this clause (ii)).

(*Id.* § 1.)  The Master Agreement states:

Without limiting the generality of the foregoing, it is intended, as more particularly provided herein, that this Master Agreement be integrated with, and constitute a part of, each Integrated Lease.  In that regard, certain provisions of each Lease (by way of example only, Article XI of each Lease setting forth Wachovia's Termination Rights) were written to fully reflect the terms and conditions that apply under such Lease from and after the point, if any, that it becomes a Non-Integrated Lease, but only partially reflect the terms and conditions that apply under such Lease while it remains an Integrated Lease; it being intended that (i) for so long as each Lease shall remain an Integrated Lease, it shall be read together with this Master Agreement (as an indispensable part thereof) in determining the rights of the Landlord and the Tenant under the Lease (and that, in the event of any conflict between the terms and conditions of this Master Agreement and the terms and conditions of the Lease, the terms and conditions of this Master Agreement shall control and apply in all respects, to the extent herein expressed), and (ii) from and after the point, if any, that it becomes a Non-Integrated Lease, it shall be read independent of this Master Agreement (which shall no longer be a part thereof) in determining the rights of the Landlord and the Tenant under the Lease, provided, that this clause (ii) shall not be deemed to limit, in any way, the rights and/or obligations of any party to this Master Agreement under this Master Agreement (including the obligations of Wachovia to pay any Excess Termination Rights Payments pursuant to Section 3.4 hereof).

(*Id.* Background ¶ D.)  The Master Agreement categorized the Leases as either "Integrated" or

"Non-Integrated" Leases.  "Integrated Lease" was defined as "any Lease, other than a Non-

Integrated Lease."  (*Id.* § 1.)  On the date the Master Agreement was consummated, all of the

Leases were deemed to be Integrated Leases.  (*Id.*)  "Non-Integrated Leases," on the other hand, were defined as

> any Lease with respect to which a Non-Integration Event has occurred. Notwithstanding the foregoing, if (I) a Lease theretofore became a Non-Integrated Lease solely by reason [of] the occurrence of the Non-Integration Event described in clause (b)(2) of the definition thereof, (II) subsequent thereto, an Acceleration Rescission Notice is delivered by the Designated Portfolio Lender, (III) no other intervening Non-Integration Event shall have occurred with respect to such Lease, and (IV) upon the delivery of the Acceleration Rescission Notice, the Landlord's Estate in such Lease is held by the Master Landlord or a Wholly-Owned Subsidiary of the Master Landlord, then such Lease shall no longer be [a] Non-Integrated Lease (i.e., it shall be reinstated as an Integrated Lease) unless and until another Non-Integration Event shall occur.

(*Id.* (italics omitted).)

The Master Agreement set forth certain conditions on Wachovia's ability to terminate the Leases, irrespective of whether Wachovia continued to be the tenant in possession under a particular Lease.  As relevant here, the Master Agreement provides:

3. <u>Limitations on Wachovia's Termination Rights</u>.

3.1  As expressed in <u>Article XI</u> of the Leases, Wachovia may, from time to time during the Initial Term (but not during any Renewal Term), exercise Wachovia's Termination Rights to terminate a Lease with respect to all or any portion(s) of the then Base Leased Premises under any Lease, all in the manner and subject to the terms and conditions set forth in such <u>Article XI</u>.

3.2  Notwithstanding the foregoing, it is not the intention of the parties hereto that Wachovia's Termination Rights be unconditional as between Master Landlord (and, if applicable, any Landlord), on the one hand, and Wachovia, on the other; more specifically, (i) Wachovia's exercise of Wachovia's Termination Rights under any Integrated Lease, shall be subject to the provisions of Section 3.3 below, and (ii) Wachovia's exercise of Wachovia's Termination Rights under any Non-Integrated Lease, shall be subject to the provisions of Section 3.4 below.

3.3  With respect to all Integrated Leases, Wachovia's Termination Rights may be validly and effectively exercised if, and only if, at the time of such exercise, the then Available Termination Rights Area is equal to or greater than the Exercise Termination Area as to the exercise of such Wachovia's Termination Rights; and any purported exercise by Wachovia of Wachovia's Termination Rights under any Integrated Leases at a time when the then Available Termination Rights Area is

less than the purported Exercise Termination Area as to the exercise of such Wachovia's Termination Rights shall be rendered void and of no force or effect (but the fact that such purported exercise is rendered null and void shall not prevent any subsequent exercise by Wachovia of Wachovia's Termination Rights consistent with the provisions hereof).

      3.4  With respect to all Non-Integrated Leases, Wachovia's Termination Rights may be validly and effectively exercised even if, at the time of such exercise, the then Available Termination Rights Area is less than the Exercise Termination Area as to the exercise of such Wachovia's Termination Rights (it being understood that neither Master Landlord, any Landlord, nor any other party, shall have any right to object to any exercise of Wachovia's Termination Rights under any Non-Integrated Lease under any circumstances); but, in such event, Wachovia shall (on or prior to the Early Termination Date) pay the Excess Termination Rights Payment with respect [to] such exercise by Wachovia to (i) the Designated Portfolio Lender, if there is a Designated Portfolio Lender, or (ii) the Master Landlord, if there is no Designated Portfolio Lender; in each case, such payment shall be sent to such party at the address provided to Wachovia therefor (or, at the election of such party, . . . by wire transfer of immediately available funds to an account designated by such party).  In no event will the obligation of Wachovia to pay Rent under a Non-Integrated Lease terminate until the applicable Excess Termination Rights Payment required pursuant to this Section 3.4 is paid pursuant hereto; it being understood that any payment made [by] Wachovia to a Depositary (or a court of competent jurisdiction) consistent with the provisions of Section 3.5 hereof shall be deemed paid pursuant hereto.

(*Id.* § 3 (italics omitted).)  The definition and calculation of an "Excess Termination Rights Payment" is not relevant for purposes of this Motion.

      Also on September 22, 2004, Wachovia and FSI entered into a lease (the "Lease Agreement"), the interpretation of which gives rise to this Action.  (Compl. ¶ 23.)  Wachovia leased back from FSI a multi-story office building (the "Building") located at 130 Wyoming Avenue, Scranton, Pennsylvania.  (*Id.* ¶ 14.)  The Lease Agreement, which terminates in 2024, (*id.* ¶ 37), contains the following provisions relating to Wachovia's right to terminate the agreement:

11.1 <u>Wachovia's Termination Right</u>

      (a)  Subject to the terms and conditions of this <u>Article XI</u>, during the Initial Term of this Lease (but not during any Renewal Term), Wachovia shall have the

right (herein called "Wachovia's Termination Right"), exercisable from time to time, to terminate this Lease with respect to all or any portion(s) of the then Leased Premises (other than the whole or any portion(s) of any Short-Term Additional Space then constituting a part of the Leased Premises). Wachovia may exercise Wachovia's Termination Right only by written notice to Landlord (each, a "Termination Rights Exercise Notice"), which shall (i) indicate whether Wachovia is exercising Wachovia's Termination Right with respect to the entirety of the then Leased Premises (which may be done only if no Short-Term Additional Space then constitutes a part of the Leased Premises), or less than the entirety of the then Leased Premises, (ii) in any case that Wachovia is exercising Wachovia's Termination Right with respect to less than the entirety of the then Leased Premises, specify, with particularity, the portion(s) of the Leased Premises with respect to which Wachovia's Termination Right is being exercised (such portion(s) of the Leased Premises being herein separately referred to as the "Vacate Space"), and be accompanied by a floor plan showing the location and configuration of the Vacate Space, (iii) the date upon which Wachovia is electing to terminate this Lease with respect to the entirety of the Leased Premises or the Vacate Space, as the case may be, which date shall not be earlier than the date that is nine (9) months after the date of Wachovia's Termination Rights Exercise Notice (such date being herein called the "Early Termination Date"). Notwithstanding the foregoing, Wachovia's right to specify Vacate Space comprising less than all of the then Base Leased Premises located on any floor of the Building, shall be contingent upon such Vacate Space being of a size and configuration that makes it separately leasable to third party tenants.

(b) Notwithstanding the provisions of Section 11.1(a) above, during the Integration Period, Wachovia's Termination Right shall be limited by the provisions of Section 3.3 of the Master Agreement.

(c) Notwithstanding anything to contrary contained herein, it is understood and agreed that Wachovia's Termination Right shall belong solely to Wachovia, and, notwithstanding any Assignment, shall survive as a right belonging solely to Wachovia for the balance of the Initial Term. Accordingly, Wachovia's Termination Right may be exercised, at anytime during the Initial Term, by, and only by, Wachovia (whether or not Wachovia is then the Tenant hereunder). Upon request of Wachovia made, from time to time, during any period that Wachovia is not the Tenant hereunder, Landlord shall acknowledge the foregoing in writing.

(*Id.* Ex. A ("Lease Agreement") § 11.) The definition of "Wachovia" is slightly different than the definition provided by the Master Agreement. Wachovia is defined as:

(i) Tenant Named Herein, or (ii) a person constituting an immediate or remote successor to Tenant Named Herein by virtue of one or more mergers, consolidations and/or transfers of all, or substantially all, the assets of Tenant Named Herein (or another person described in this clause (ii)).

6

(Lease Agreement § 1.1(b).)  "Assignment," as used in § 11.1(c), is defined as:

>   8.1.1   For purposes of this Lease, the following terms shall have the following meanings:
>
>   (a)   "<u>Assignment</u>" shall mean any assignment or other transfer of Tenant's interest in this Lease (whether voluntarily, by operation of law or otherwise); it being agreed that a Change of Control Transaction with respect to Tenant shall also be deemed an "Assignment" (and shall be deemed entered into by Tenant), but only if a principal purpose or effect of such Change in Control Transaction is the transfer of Tenant's interest in this Lease.
>
>   (b)   "<u>Change in Control Transaction,</u>" with respect to a person, shall mean any transaction or related series of transactions (including any transfer(s) of stock or partnership, membership or other equity interests) which results, directly or indirectly, in a change in the control of such person (except, that, as used in this definition, the term "transaction" shall not include sales or issuances of stock over a recognized stock exchange or "over-the-counter" market or otherwise as part of a public offering).

(*Id.* § 8.1 (italics omitted).)  Finally, the Lease Agreement contains a provision relating to a waiver of any of its provisions:

7.5  <u>No Waiver of Rights</u>

>   No failure or delay of Landlord or Tenant in any one instance to exercise any remedy or power given it herein or to insist upon strict compliance by Tenant or Landlord of any obligation imposed on it herein in any other instance and no custom or practice of either party hereto at variance with any term hereof shall constitute a waiver or a modification of the terms hereof by such party in any one instance or any right it has herein to demand strict compliance with the terms hereof by the other party in any other instance.  No express waiver shall affect any condition, covenant, rule, or regulation other than the one specified in such waiver and then only for the time and in the manner specified in such waiver.  No person has or shall have any authority to waive any provision of this Lease unless such waiver is expressly made in writing and signed by an authorized officer of Landlord or Tenant.  No endorsement or statement on any check or letter accompanying any check or payment as Rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other remedy provided in this Lease.

(*Id.* § 7.5.)

From September 22, 2004 through April 1, 2008, the Lease Agreement was an Integrated Lease.  (Compl. ¶ 31.)  On April 1, 2008, FSI and Wachovia entered into a Second Amendment to the Master Agreement, which reclassified the Lease Agreement as a Non-Integrated Lease. (*Id*. ¶ 32; *see also id.* Ex. C § 5.)

On April 11, 2008, FSI transferred and assigned to Plaintiff the Lease Agreement.  (*Id*. ¶¶ 15, 38; *see also id.* Ex. E.)  At the time of the assignment, Wachovia was the tenant of the Building.  (*Id.* ¶ 40.)  In October 2008, Wachovia experienced "heavy losses" in its loan portfolios and Wachovia's parent company, Wachovia Corporation, was acquired by Wells Fargo & Company, Wells Fargo's parent corporation.  (*Id.* ¶ 45.)  After the acquisition, Wells Fargo assumed Wachovia's liability under the Lease Agreement and commenced paying rent for utilizing the space.  (*Id.* ¶ 47.)[1]

On November 30, 2012, Wells Fargo sent a termination notice ("Termination Notice") to Plaintiff.  (*Id.* ¶ 49.)  The Termination Notice stated:

> This letter shall serve as a Wells Fargo Termination Rights Exercise Notice pursuant to Section 11.1 of the Lease [Agreement].  Wells Fargo hereby exercises Wells Fargo's Termination Right with respect to the Third Floor (Unit #2) totaling 7,515 rsf.  The Early Termination Date for the Third Floor (Unit #2) shall be August 30, 2013.  Terms used in this letter but not defined herein shall have the meanings ascribed to them in the Lease [Agreement].

(*Id.* Ex. G ("Termination Notice").)  The Termination Notice was not accompanied by a floor plan showing the location and configuration of the portion of the lease that Wells Fargo was attempting to vacate.  (*Id.* ¶ 53.)  In a letter dated July 8, 2013, Plaintiff objected to the Termination Notice on the ground that it failed to include a floor plan, and argued that Wells

---

[1] Plaintiff and Wells Fargo entered into a First Amendment to the Lease Agreement in March 2010.  (*Id.* ¶ 48; *see also id.* Ex. F.)  The First Amendment incorporated into the Lease Agreement certain terms and provisions pertaining to Plaintiff's conversion of the Building into a condominium form of ownership.  (*Id.* ¶ 49.)

Fargo could not exercise the right to terminate any portion of the Lease Agreement because that right belonged solely to Wachovia.  (*Id.* Ex. I (citing Lease Agreement § 11.1(c)).)  Wells Fargo, via two letters, disagreed with Plaintiff's interpretation of the Lease Agreement.  (*Id.* Ex. H.)  In the second letter, Wells Fargo reiterated its intention to terminate a portion of its lease and attached a floor plan.  (*Id.* Ex. H, at 4–10.)

Plaintiff alleges that the Termination Notice was ineffective for three separate reasons. First, it "did not contain a floor plan showing the location and configuration of the Vacate Space as required by [§] 11.1(a) of the Lease Agreement."  (*Id.* ¶ 56 (internal quotation marks omitted).)  Second, § 11.1 of the Lease Agreement limited the right to terminate the Lease Agreement to Wachovia itself.  (*Id.* ¶ 57.)  According to Plaintiff, because Wells Fargo is not Wachovia, it cannot terminate the Lease Agreement.  (*Id.* ¶ 59; *see also* Lease Agreement § 11.1(c) ("Notwithstanding anything to contrary contained herein, it is understood and agreed that Wachovia's Termination Right shall belong solely to Wachovia, and, notwithstanding any Assignment, shall survive as a right belonging solely to Wachovia for the balance of the Initial Term . . . .").)  Finally, Plaintiff alleges that the Termination Notice failed to address the applicability of the Excess Termination Rights Payment required by § 3.4 of the Master Agreement for the termination of certain Non-Integrated Leases.  (Compl. ¶¶ 60–63.)

Wells Fargo has allegedly breached the Lease Agreement because it has not paid Plaintiff the full amount owing under the Lease Agreement since September 1, 2013.  (*Id.* ¶ 69.)  Plaintiff alleges that Wells Fargo owes it $385,077.60 in rent and other fees.  (*Id.* ¶ 78.)  Plaintiff seeks in excess of $2 million for Wells Fargo's breach, requesting the value of the rent payments Wells Fargo is obligated to make until the Lease Agreement expires in 2024.  (*Id.* ¶ 80.)

B.  Procedural Background

Plaintiff initiated this Action by filing a Complaint on November 25, 2015.  (Dkt. No. 1.)
Pursuant to a Motion Scheduling Order, (Dkt. No. 15), Wells Fargo filed the Motion and
supporting papers on April 11, 2016, (Dkt. Nos. 18–20).  Plaintiff filed opposition papers on
May 11, 2016.  (Dkt. Nos. 21–23.)  Wells Fargo filed a reply on May 27, 2016.  (Dkt. No. 24.)
On January 6, 2017, the Court solicited supplemental briefing on whether the case should be
transferred to the Middle District of Pennsylvania.  (Dkt. No. 25.)  The Parties submitted
supplemental papers on January 13, 2017.  (Dkt. Nos. 26–27.)

## II.  Discussion

A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual
allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the 'grounds' of
his [or her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic
recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S.
544, 555 (2007) (second alteration in original).  Instead, the Supreme Court has emphasized that
"[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*,
and that "once a claim has been stated adequately, it may be supported by showing any set of
facts consistent with the allegations in the complaint," *id.* at 563.  A plaintiff must allege "only
enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.  But if a plaintiff
has "not nudged [his or her] claims across the line from conceivable to plausible, the[] complaint
must be dismissed."  *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining
whether a complaint states a plausible claim for relief will . . . be a context-specific task that
requires the reviewing court to draw on its judicial experience and common sense.  But where

10

the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).

For purposes of Wells Fargo's Motion, the Court is required to consider as true the factual allegations contained in the Complaint. *See Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) ("We review de novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (italics and internal quotation marks omitted)); *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008) (same). "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).

B.  Breach of Contract

Wells Fargo argues that Plaintiff's Complaint must be dismissed because it terminated in November 2012 the portion of the Lease Agreement giving rise to this Action and therefore has no contractual obligation to pay to Plaintiff the sum it seeks. Plaintiff contends first that Wells Fargo did not possess the contractual right to terminate any portion of the Lease Agreement because that right belongs solely to Wachovia, and second, that even if Wells Fargo could terminate the Lease Agreement, Wells Fargo's Termination Notice was deficient because it did not contain a floor plan or specify the amount of any Excess Termination Rights Payment. Wells Fargo responds that it substantially complied with the Lease Agreement's termination provisions and, in any event, Plaintiff waived strict compliance with those provisions. Wells Fargo further

contends that it is under no obligation to pay to Plaintiff an Excess Rights Termination Payment because the provisions Plaintiff relies upon are inapplicable to the Parties to this Action.  The Court addresses each of these arguments in turn below.

### 1.  General Principles of Contract Law in Pennsylvania

The Parties agree that the Lease Agreement is a contract governed by Pennsylvania law. (Def.'s Mem. of Law in Supp. of Mot. To Dismiss, or, in the alternative, To Transfer ("Def.'s Mem.") 8 (Dkt. No. 19); Pl.'s Mem. of Law in Opp'n to Def.'s Mot. ("Pl.'s Opp'n") 2 (Dkt. No. 21).)  *See Humberston v. Chevron U.S.A., Inc.*, 75 A.3d 504, 509 (Pa. Super. Ct. 2013) (stating that "a lease is in the nature of a contract and is controlled by principles of contract law" (internal quotation marks omitted)).  The Court therefore also assumes that Pennsylvania law governs this dispute.  *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law." (alteration and internal quotation marks omitted)); *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d Cir. 1995) ("Because both parties agree that New York cases are controlling, we shall assume that New York law governs this diversity action.").

In Pennsylvania, "[t]o successfully maintain a cause of action for breach of contract the plaintiff must establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages."  *Hart v. Arnold*, 884 A.2d 316, 332 (Pa. Super. Ct. 2005).  Regarding contract interpretation under Pennsylvania law,

> [t]he fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties.  The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself.  The whole instrument must be taken together in arriving at contractual intent.  Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed.  When a writing is clear and unequivocal, its meaning must be determined by its contents alone.

*Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001) (citations and internal quotation marks omitted). Pennsylvania courts "will not interpret one provision of a contract in a manner which results in another portion being annulled." *Lesko v. Frankford Hosp.-Bucks Cty.*, 15 A.3d 337, 342 (Pa. 2011) (internal quotation marks omitted). "Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999) (internal quotation marks omitted). In the absence of ambiguity, the plain meaning of a contract "presents a question of law." *Lesko*, 15 A.3d at 342; *see also Murphy*, 777 A.2d at 430 ("The meaning of an unambiguous written instrument presents a question of law for resolution by the court.").

### 2.  Whether Wells Fargo Can Terminate the Lease Agreement

Wells Fargo argues that the Lease Agreement provides it (and not just Wachovia) with the ability to terminate a portion of the leased space. (Def.'s Mem. 7.) It contends that the Lease Agreement, "in conjunction with the legal implications of a national bank merger under state and federal law, clearly provides [Wells Fargo] with the same rights and obligations previously held by Wachovia under the Lease Agreement." (*Id.*) In response, Plaintiff argues that Wells Fargo cannot terminate any portion of the lease because that right "belong[s] solely to Wachovia," (Lease Agreement § 11.1(c)), and Wells Fargo is not Wachovia, (Pl.'s Opp'n 4–6).

Plaintiff's interpretation of the Lease Agreement is unsupported by the plain meaning of the Lease Agreement's terms. The Lease Agreement provides that "*Wachovia* shall have the right . . . to terminate this Lease with respect to all or any portion(s) of the then Leased Premises." (Lease Agreement § 11.1(a) (emphasis added).) Section 11.1(c) clarifies that this right "belong[s] solely to *Wachovia*, and, notwithstanding any Assignment, shall survive as a

right belonging solely to *Wachovia* for the balance of the Initial Term." (*Id.* § 11.1(c) (emphases added); *see also id.* ("*Wachovia's* Termination Right may be exercised, at anytime during the Initial Term, by, and only by, *Wachovia* (whether or not *Wachovia* is then the Tenant hereunder)." (emphases added)).)  In turn, Wachovia is defined to include "a person constituting an immediate or remote successor to Tenant Named Herein by virtue of one or more mergers, consolidations and/or transfers of all, or substantially all, the assets of Tenant Named Herein." (*Id.* § 1.1(b).)  That same provision defines Wachovia as "Tenant Named Herein." (*Id.*)  Thus, §§ 11.1(a) and (c) unambiguously provide that Wachovia and its immediate and remote successors possess the right to terminate the Lease Agreement because "Wachovia" is defined to include those entities.  It is clear from these provisions that the Lease Agreement contemplated the factual scenario giving rise to this litigation—Wachovia merging with another company— and specifically provides that the surviving entity has the same rights and obligations previously vested in Wachovia.  In other words, after Wachovia and Wells Fargo merged, Wells Fargo was Wachovia's immediate successor, and therefore any time that the Lease Agreement uses "Wachovia," it must be read as including Wells Fargo.  (*See* Def.'s Mem. 8 ("Wachovia is Wells Fargo.").)  It is clear from the plain meaning of the Lease Agreement that the language limiting the termination right to Wachovia was inserted to govern situations in which Wachovia subleased the space to another tenant or assigned the lease to an entity not satisfying the definition of "Wachovia."  Under those circumstances, the assignee or subletee cannot terminate the lease; only Wachovia or its immediate successor, such as Wells Fargo, can.  Those circumstances, however, are not present here.  Wells Fargo is the immediate successor to Wachovia, and is therefore "Wachovia" for purposes of interpreting the Lease Agreement.

Moreover, this interpretation of the Lease Agreement comports with both federal and Pennsylvania law. Under federal law "[o]ne or more national banking associations or one or more State banks, with the approval of the Comptroller . . . may merge into a national banking association." 12 U.S.C. § 215a(a). "The corporate existence of each of the merging banks or banking associations participating in such merger shall be merged into and continued in the receiving association and such receiving association shall be deemed to be the same corporation as each bank or banking association participating in the merger." *Id.* § 215a(e). "All rights, franchises, and interests of the individual merging banks or banking associations in and to every type of property . . . [are] transferred to and vested in the receiving association by virtue of such merger . . . ." *Id.* Therefore, Wells Fargo assumed all of the rights, liabilities, and obligations of Wachovia as a result of its merger with Wachovia pursuant to § 215a.

Pennsylvania has a similar law on its books. *See* 15 Pa. Cons. Stat. § 336(a)(6)(iii) ("If the surviving association exists before the merger . . . [a]ll [of] its rights, privileges, immunities[,] and powers continue to be vested without change in it."). Subsection (a) of this statute

> states the general understanding that in a merger the property and liabilities of the merging associations automatically vest in the surviving association. The surviving association becomes the owner of all real and personal property of the merged associations and is subject to all debts, obligations, and liabilities of the merging associations. A merger does not constitute a transfer, assignment, or conveyance of any property held by the merging associations prior to the merger. A merger also does not give rise to a claim that a contract with a merging association is no longer in effect on the grounds of nonassignability, unless the contract specifically provides that it does not survive a merger.

*Id.* § 336 cmt. 2014. The comment to § 336 also notes that subsection (a) was intended to confirm the holding of the Pennsylvania superior court in *Santa Fe Energy Resources, Inc. v. Manners*, 635 A.2d 648 (Pa. Super. 1993). *Id.* In *Santa Fe*, two landowners entered into an oil

and gas lease agreement with Robert M. Hanak.  635 A.2d at 648.  The lease gave Hanak the

exclusive right to explore and mine for oil and gas on the landowners' plot of land.  *Id.*  The

lease permitted Hanak to enter into an assignment with the Adobe Oil and Gas Corporation

("Adobe Oil"), but prohibited all other assignments without the landowners' permission.  *Id.*

Hanak thereafter assigned the lease to Adobe Oil.  *Id.*  Adobe Oil subsequently merged with

Madison Resources, Inc., to form Adobe Resources Corporation ("Adobe Resources").  *Id.* at

649.  Adobe Resources then merged with Santa Fe Energy Resources, Inc.  ("Santa Fe").  *Id.*

The landowners prohibited Santa Fe from entering their land on the ground that the mergers

constituted assignments, which they did not approve.  *Id.*  The court held that "when a corporate

party to a contract merges with a third party[,] the contract is not assigned to the new entity by

operation of law."  *Id.*  Rather, "the surviving entity succeeds to both the rights and obligations

of the constituent corporations."  *Id.*

Thus, under state and federal law, Wells Fargo has the same rights under the Lease

Agreement that Wachovia held prior to the merger.  Wells Fargo automatically became

Wachovia for purposes of the Lease Agreement following the merger of the two companies.

Because Wells Fargo is Wachovia for purposes of the Lease Agreement, Wells Fargo possessed

the power to terminate the Lease Agreement pursuant to the terms of § 11.

Plaintiff concedes that 12 U.S.C. § 215a and 15 Pa. Cons. Stat. § 336 are generally

applicable, but contends that under the terms of the Lease Agreement, the merger between

Wachovia and Wells Fargo constitutes an assignment, and Lease Agreement § 11.1 does not

permit an assignee to exercise Wachovia's termination right.  (Pl.'s Opp'n 2–5.)  Plaintiff further

concedes that Wells Fargo's interpretation of the definition of "Wachovia" is correct, but

believes that "Wachovia" has a special meaning for purposes of § 11.1(c).  (*Id.* at 4.)  According

16

to Plaintiff, "[i]f 'Wachovia' in § 11.1(c) includes any immediate or remote successor of Wachovia, then there would be no reason for the language 'it is understood and agreed that Wachovia's Termination Right shall belong solely to Wachovia, and, notwithstanding any Assignment, shall survive as a right belonging to 'Wachovia' . . . to be included." (Pl.'s Opp'n 4–5 (quoting Lease Agreement § 11.1(c)).) There are at least three problems with this interpretation. First, Plaintiff has not cited a single case holding that a contractual term should be interpreted to have multiple meanings where that term is specifically defined, as "Wachovia" is here. Second, "Wachovia" is defined in § 1.1(b) of the Lease Agreement. The preamble to § 1.1(b) states:

> As used in this Lease, the following terms shall have the respective meanings indicated below, and such meanings are incorporated in each such provision where used as if fully set forth therein.

Thus, § 11.1(c), when taking into account the definition of "Wachovia" and § 1.1(b)'s direction, is properly read as stating: "Wachovia's Termination Right shall belong solely to Wachovia [and any person constituting an immediate or remote successor to Wachovia by virtue of one or more mergers, consolidations and/or transfers of all, or substantially all, the assets of Wachovia]." Third, Plaintiff's argument that portions of § 11.1(c) would be rendered superfluous under Wells Fargo's reading of the Lease Agreement is factually incorrect. Section § 11.1(c) governs the circumstances in which "Wachovia" is not the tenant of the Building.[2]

Plaintiff argues next that the merger between Wachovia and Wells Fargo was actually an assignment. Plaintiff misleadingly asserts that Article VIII of the Lease Agreement "defines an 'Assignment' as 'any assignment or other transfer of Tenant's interest in this Lease.'" (Pl.'s

---

[2] Plaintiff notes that § 11.1(c) begins by stating "[n]otwithstanding anything to contrary contained herein," but this language is not a valid basis upon which to conclude "Wachovia" has a special meaning in § 11 of the Lease Agreement.

Opp'n 5.)  This contention is misleading because Plaintiff omitted the other half of the definition.

The Lease Agreement states:

> (a)  "<u>Assignment</u>" shall mean any assignment or other transfer of Tenant's interest in this Lease (whether voluntarily, by operation of law or otherwise); *it being agreed that a Change of Control Transaction with respect to Tenant shall also be deemed an "Assignment" (and shall be deemed entered into by Tenant), but only if a principal purpose or effect of such Change in Control Transaction is the transfer of Tenant's interest in this Lease.*

(Lease Agreement § 8.1.1(a) (emphasis added).)  In turn, "Change in Control Transaction" is defined as "any transaction or related series of transactions . . . which results, directly or indirectly, in a change in the control of such person."  (*Id.* § 8.1.1(b).)  Under the plain meaning of § 8.1.1(a), mergers, which constitute Change in Control Transactions, are not assignments, unless of course, the "principle purpose or effect of such Change in Control Transaction is the transfer of Tenant's interest in th[e] Lease."  (*Id.* § 8.1.1(a).)  Plaintiff has not alleged that the principle purpose of the merger between Wachovia and Wells Fargo was to transfer Wachovia's interest in the Lease Agreement, and therefore, the merger was not an "Assignment."

Plaintiff notes that Lease Agreement § 8.5.1(a) permits Wachovia to enter into

> [a]n Assignment to any person with which, or into which, Tenant is merged or consolidated, or to which all or substantially all of Tenant's assets are transferred, so long as the transfer of Tenant's interest in this Lease is not a principal purpose or effect of such merger, consolidation or asset transfer.[3]

Plaintiff interprets this provision to mean that all mergers are assignments.  (Pl.'s Opp'n 5.)  Section 8.5.1(a), however, does not define "Assignment"; it merely states the circumstances under which assignments may occur.  As noted, the provision that defines "Assignment" does not define that term to include mergers.  (*See* Lease Agreement § 8.1.1(a).)  Moreover, if the Court were to adopt Plaintiff's interpretation it would render a large swath of the definition of

---

[3]  "Tenant" is defined as Wachovia.  (*See* Lease Agreement Preamble.)

"Wachovia" superfluous.  (*See id.* § 1.1(b) (defining "Wachovia" to include "a person constituting an immediate or remote successor to Tenant Named Herein by virtue of one or more mergers, consolidations and/or transfers of all, or substantially all, the assets of Tenant Named Herein").)  It is a well-known axiom of contract law that "a construction which neutralizes any provision of a contract should never be adopted."  *Contrans, Inc. v. Ryder Truck Rental, Inc.*, 836 F.2d 163, 169 (3d Cir. 1987) (internal quotation marks omitted).  Wells Fargo's interpretation, on the other hand, does not vitiate any of the Lease Agreement's terms.

The unambiguous terms of the Lease Agreement, federal law, and state law reveal that Plaintiff's interpretation of the Lease Agreement is divorced from the plain meaning of the agreement's terms.  Plaintiff's interpretation is flawed because it seeks to treat Wells Fargo as Wachovia when beneficial to Plaintiff, but treat Wells Fargo as an entity distinct from Wachovia when not.  The generally applicable principles of contract interpretation prohibit such an interpretation.  For purposes of the Lease Agreement, Wells Fargo is "Wachovia."  Therefore, Wells Fargo may terminate the Lease Agreement pursuant to § 11.

### 3.  The Effectiveness of Wells Fargo's Termination Notice

Plaintiff alleges that even if Wells Fargo can terminate the Lease Agreement, Wells Fargo's Termination Notice was defective because it did not contain a floor plan for the space Wells Fargo sought to vacate.  (Pl.'s Opp'n 7.)  The Lease Agreement provides:

> Wachovia may exercise Wachovia's Termination Right only by written notice to Landlord (each, a "Termination Rights Exercise Notice"), which shall (i) indicate whether Wachovia is exercising Wachovia's Termination Right with respect to the entirety of the then Leased Premises (which may be done only if no Short-Term Additional Space then constitutes a part of the Leased Premises), or less than the entirety of the then Leased Premises, (ii) in any case that Wachovia is exercising Wachovia's Termination Right with respect to less than the entirety of the then Leased Premises, specify, with particularity, the portion(s) of the Leased Premises with respect to which Wachovia's Termination Right is being exercised (such portion(s) of the Leased Premises being herein separately referred to as the "Vacate

Space"), and be accompanied by a floor plan showing the location and
configuration of the Vacate Space, (iii) the date upon which Wachovia is electing
to terminate this Lease with respect to the entirety of the Leased Premises or the
Vacate Space, as the case may be, which date shall not be earlier than the date that
is nine (9) months after the date of Wachovia's Termination Rights Exercise Notice
(such date being herein called the "Early Termination Date").

(Lease Agreement § 11.1(a).)  Because Wells Fargo sought to vacate only the third floor of the

Building, (*see* Termination Notice), it was contractually obligated to provide Plaintiff with a

floor plan for the Building's third floor.  Wells Fargo failed to do so.  (Compl. ¶ 53.)

Wells Fargo nonetheless contends that Plaintiff's Complaint must be dismissed because

Wells Fargo substantially complied with the Lease Agreement's early termination provisions.

(Def.'s Mem. 12.)  Under Pennsylvania law, the doctrine of substantial performance

has been developed by the courts as an instrument of justice intended to avoid
forfeiture because of technical, inadvertent or unimportant omissions.  It is intended
for the protection and relief of those who have faithfully and honestly endeavored
to perform their contracts in all material and substantial particulars, so that their
right to compensation may not be forfeited by reason of mere technical, inadvertent
or unimportant omissions or defects.

*First Mortg. Co. of Pa. v. Carter*, 452 A.2d 835, 837 (Pa. Super. Ct. 1982) (internal quotation

marks omitted).  The Court finds this argument unpersuasive at this stage of the litigation

because "[t]he question [of] whether performance is 'substantial' is generally a question of fact,"

14 Williston on Contracts § 44:52 (4th ed. 2016); *see also Int'l Diamond Imps., Ltd. v.

Singularity Clark, L.P.*, 40 A.3d 1261, 1272 (Pa. Super. Ct. 2012) ("We emphasize that we and

other courts consistently have treated inquiries into the materiality of a given breach as fact

questions rather than questions of law to be decided from the bench."), and the Court cannot

resolve questions of fact on a motion to dismiss.[4]  Moreover, Wells Fargo has overlooked the

---

[4] The Court notes that it is unclear whether the doctrine of substantial performance is
even applicable to the facts of this case.  As Plaintiff argues, "[t]he substantial performance

body of law governing the interpretation and enforcement of termination provisions in

Pennsylvania.  As one court has explained:

> In Pennsylvania, conditions precedent to a contract termination must be strictly
> fulfilled.   Where the contract provides a specific means of cancellation or
> termination, neither [the] plaintiff nor [the] defendant can dispense with such
> manner of cancellation or rescission without the consent of the other.

*Pers. Data Sys., Inc. v. Grand Casinos, Inc.*, No. 97-CV-4896, 1998 WL 437268, at *5 (E.D. Pa.

July 30, 1998) (citation and internal quotation marks omitted); *see also Wright v. Bristol Patent*

*Leather Co.*, 101 A. 844, 845 (Pa. 1917) ("Where a contract reserves to one of the parties the

right to rescind it, and also prescribes the mode in which such right shall be exercised, or

provides that certain specified acts shall be done by that party as a condition upon his right to

rescind, it must be strictly followed, and the party cannot rescind in any other mode nor without

complying with the conditions." (internal quotation marks omitted)); *Int'l Diamond Imps.*, 40

A.3d at 1271 ("Except in cases of material breach, conditions precedent to a contract termination

must be strictly fulfilled." (internal quotation marks omitted)).  In *Personnel Data*, "[t]he parties

clearly intended that all notices described in the [agreement] be sent by U.S. certified mail . . .

before termination would be effective."  1998 WL 437268, at *5 (internal quotation marks

omitted).  The court held that oral notice was "insufficient as a matter of law."  *Id.*  Thus, even

though Plaintiff was aware that Wells Fargo intended to terminate a portion of its lease, Wells

Fargo did not strictly comply with the terms of the Lease Agreement.  The Court therefore

declines to dismiss Plaintiff's Complaint on the basis of substantial compliance.

Wells Fargo contends that even though the Termination Notice was technically deficient,

Plaintiff, by waiting several months to inform Wells Fargo that the Termination Notice was

---

doctrine was developed to shield a party performing in good faith from the dissolution of a
contract based upon a minor breach."  (Pl.'s Opp'n 8.)

defective, waived its right to technical compliance with the Lease Agreement's termination provisions. Indeed, Wells Fargo sent the Termination Notice to Plaintiff in November 2012, but Plaintiff did not respond until July 2013. (*See* Compl. ¶¶ 49, 65.) The Court, however, cannot dismiss Plaintiff's Complaint on this basis because Pennsylvania courts generally treat waiver as a question of fact. *See Cole v. Phila. Co.*, 26 A.2d 920, 924 (Pa. 1942) ("Whether there has been a waiver is usually a question of fact."); *see also Warminster Equities, LLC v. Warminster Commerce, LLC*, 497 F. App'x 187, 193 (3d Cir. 2012) ("Ordinarily, the question of waiver is a question of fact for a jury."). Only when one reasonable conclusion exists can waiver be determined as a matter of law. *See Linda Coal & Supply Co. v. Tasa Coal Co.*, 204 A.2d 451, 454 (Pa. 1964) ("[W]aiver can be determined, as a matter of law, where only one reasonable conclusion can be drawn from the undisputed facts."). It is unclear, at this early stage of the litigation, which facts are undisputed, and thus the Court cannot determine as a matter of law whether Plaintiff waived its right to technical compliance with the Lease Agreement's termination provisions.[5]

Plaintiff argues finally that, in any event, Wells Fargo's attempted termination was ineffective for a third reason—Wells Fargo did not calculate whether it owed Plaintiff an Excess Termination Rights Payment pursuant to Master Agreement § 3.4. (Pl.'s Opp'n 15.) Plaintiff argues that an Excess Termination Rights Payment is necessary because both Parties are subject to the terms of the Master Agreement. This argument represents a fundamental misunderstanding of the unambiguous terms of both the Lease Agreement and the Master Agreement.

---

[5] The Court notes that the Lease Agreement also contains a no-waiver clause. (*See* Lease Agreement § 7.5.)

FSI and Wachovia executed the Master Agreement in September 2004.  (Compl. ¶ 23.)
On the date the Master Agreement was executed, all of the underlying lease agreements,
including the Lease Agreement, were Integrated Leases.  (Master Agreement § 1 ("On the date
hereof, all of the Leases are Integrated Leases.").)  On April 1, 2008, FSI and Wachovia entered
into the Second Amendment to the Master Agreement, which reclassified the Lease Agreement
as a Non-Integrated Lease.  (Compl. ¶ 32.)  On April 11, 2008, FSI assigned to Plaintiff "all of
its right, title and interest, as landlord, in the [Lease Agreement]."  (*Id.* Ex. E § 1; *see also id.*
¶ 38.)  Plaintiff concedes that the Lease Agreement was a Non-Integrated Lease at the time of the
assignment.  (*Id.* ¶ 39.)

Despite the fact that the Lease Agreement is Non-Integrated, Plaintiff contends that the
Lease Agreement is subject to § 3.4 of the Master Agreement, which states:

> With respect to all Non-Integrated Leases, Wachovia's Termination Rights may be
> validly and effectively exercised even if, at the time of such exercise, the then
> Available Termination Rights Area is less than the Exercise Termination Area as
> to the exercise of such Wachovia's Termination Rights (it being understood that
> neither Master Landlord, any Landlord, nor any other party, shall have any right to
> object to any exercise of Wachovia's Termination Rights under any Non-Integrated
> Lease under any circumstances); but, in such event, Wachovia shall (on or prior to
> the Early Termination Date) pay the Excess Termination Rights Payment with
> respect [to] such exercise by Wachovia to (i) the Designated Portfolio Lender, if
> there is a Designated Portfolio Lender, or (ii) the Master Landlord, if there is no
> Designated Portfolio Lender; in each case, such payment shall be sent to such party
> at the address provided to Wachovia therefor (or, at the election of such party, . . .
> by wire transfer of immediately available funds to an account designated by such
> party).  In no event will the obligation of Wachovia to pay Rent under a Non-
> Integrated Lease terminate until the applicable Excess Termination Rights Payment
> required pursuant to this Section 3.4 is paid pursuant hereto; *it being understood
> that* any payment made [by] Wachovia to a Depositary (or a court of competent
> jurisdiction) consistent with the provisions of Section 3.5 hereof shall be deemed
> paid pursuant hereto.

As first glance, this provision does appear to mandate the payment of an Excess Termination
Rights Payment upon the early termination of Non-Integrated Leases.  Upon closer examination,

however, it becomes evident that Plaintiff is misconstruing the Master Agreement.  The Master

Agreement explains that it is

> intended . . . that this Master Agreement be integrated with, and constitute a part of, each Integrated Lease . . . [, but] from and after the point, if any, that [a lease] becomes a Non-Integrated Lease, *it shall be read independent of this Master Agreement (which shall no longer be a part thereof) in determining the rights of the Landlord and the Tenant under the Lease*, provided, that this clause . . . shall not be deemed to limit, in any way, the rights and/or obligations of any party to this Master Agreement under this Master Agreement (including the obligations of Wachovia to pay any Excess Termination Rights Payments pursuant to Section 3.4 hereof).

(Master Agreement Background ¶ D (emphasis added).)  In short, this provision means that as

soon as a lease becomes Non-Integrated, it must be interpreted independent from the Master

Agreement.  However, the parties to the Master Agreement carved out from this general

understanding certain provisions of the Master Agreement, like § 3.4.  (*See id.*)  Certain, but not

all, Non-Integrated Leases are therefore subject to § 3.4.  As § 3.2 of the Master Agreement

explains:

> Notwithstanding the foregoing, it is not the intention of the parties hereto that Wachovia's Termination Rights be unconditional as between Master Landlord (and, if applicable, any Landlord), on the one hand, and Wachovia, on the other; more specifically, (i) Wachovia's exercise of Wachovia's Termination Rights under any Integrated Lease, shall be subject to the provisions of Section 3.3 below, and (ii) Wachovia's exercise of Wachovia's Termination Rights under any Non-Integrated Lease, shall be subject to the provisions of Section 3.4 below.

As is evidenced by this provision, Wachovia's right to terminate the underlying leases "*as*

*between Master Landlord (and, if applicable, any Landlord), on the one hand, and Wachovia, on*

*the other*" is "subject to the provisions of Section 3.4."  (*Id.* § 3.2 (emphasis added)).  Read as a

whole, the Master Agreement provisions relating to the termination of a Non-Integrated Lease

can be summed up as follows: The Lease Agreement, as a Non-Integrated Lease, must be read

independent of the Master Agreement, (*id.* Background ¶ D), unless the Master Landlord is the

24

owner of the Building/Lease Agreement, then Wachovia's right to terminate the Lease

Agreement is subject to Master Agreement § 3.4, (*id.* § 3.2).

The question then becomes whether Plaintiff is the "Master Landlord" as that term is

defined in the Master Agreement.  Plaintiff argues that "[p]ursuant to § 12(b) of the Master

Agreement, Plaintiff became a party to and was bound by said Master Agreement as an assignee

of FSI."  (Pl.'s Opp'n 15.)  As relevant here, § 12(b) of the Master Agreement states:

> This Master Agreement shall be binding upon, and inure to the benefit of Master
> Landlord Named Herein (as Master Landlord), and, as applicable, (I) any person
> that shall acquire the interest of Master Landlord hereunder pursuant to an
> assignment required under Section 13.3 hereof, or (II) any person that shall acquire
> the interest of Master Landlord hereunder pursuant to an assignment permitted
> under Section 13.4 hereof.

Plaintiff's contention is thus premised on its belief that FSI assigned to it FSI's interest in the

Master Agreement.  Plaintiff's belief, however, is factually incorrect.  In April 2008, FSI

assigned to Plaintiff FSI's interest in the Lease Agreement; not the Master Agreement.  (*See*

Compl. Ex. E.)  Indeed, nowhere in the document assigning FSI's interest in the Lease

Agreement is the Master Agreement even mentioned.  The Court therefore concludes that Wells

Fargo is under no contractual obligation to pay an Excess Termination Rights Payment because

Plaintiff is not the "Master Landlord."  Accordingly, the Termination Notice was not defective

for failing to discuss the Excess Termination Rights Payment.

In sum, Plaintiff has stated adequately a claim for breach of contract.  While Wells Fargo

attempted to terminate the Lease Agreement, Plaintiff has alleged that Wells Fargo's termination

attempt was ineffective.  Because the termination was allegedly ineffective, Wells Fargo was

under an obligation to pay rent pursuant to the terms of the Lease Agreement.  Wells Fargo

allegedly failed to do so and thus allegedly breached the agreement.  The possibility remains that

Wells Fargo may have been excused from strictly complying with the terms of the Lease

Agreement's termination provisions pursuant to the doctrine of substantial performance or Plaintiff's waiver of strict compliance, but the Court cannot decide those issues at this stage of the litigation.  Accordingly, Wells Fargo's Motion To Dismiss the Complaint on the ground that it fails to state a claim is denied.

C.  Motion To Transfer

Wells Fargo argues that if Plaintiff's Complaint survives Wells Fargo's Motion, the Action should be transferred to the Middle District of Pennsylvania.  (Def.'s Mem. 17.)  "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district court or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).  "The threshold question in deciding transfer of venue is whether the action could have been brought in the transferee forum."  *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 695 (S.D.N.Y. 2009) (alteration and internal quotation marks omitted).[6]  Once this element is established,

> [a]ssessing whether transfer is a valid exercise of discretion requires the Court to balance various factors: (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to sources of proof; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice.

*Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 743 (S.D.N.Y. 2013).  "The burden rests on the moving party to make a clear and convincing

---

[6] Plaintiff does not dispute that this Action could have been brought in the Middle District of Pennsylvania.

showing that transfer under [§] 1404(a) is proper." *Atl. Recording*, 603 F. Supp. 2d at 695 (internal quotation marks omitted).

### 1.  Convenience to the Witnesses

"The convenience of both party and nonparty witnesses is probably considered the single most important factor in the analysis of whether a transfer should be granted." *Aerotel, Ltd. v. Sprint Corp.*, 100 F. Supp. 2d 189, 197 (S.D.N.Y. 2000) (internal quotation marks omitted).  "A motion to transfer under § 1404(a) must be accompanied by an affidavit containing detailed factual statements identifying the potential principal witnesses expected to be called and a general statement of the substance of their testimony.  Absent such a showing, the motion should be denied." *Am. Eagle Outfitters, Inc. v. Tala Bros. Corp.*, 457 F. Supp. 2d 474, 478 (S.D.N.Y. 2006) (alteration and internal quotation marks omitted).

Wells Fargo argues generally that many of its witnesses reside in Pennsylvania, (Def.'s Mem. 19), but has identified only two witnesses—Patrick McKeon and Thomas Markert, (*see* Def.'s Supplemental Mem. of Law in Supp. of Mot. To Dismiss, or, in the alternative, To Transfer ("Def.'s Supplemental Mem.") Ex. 1 ("McKeon Decl.") (Dkt. No. 26); Decl. of Thomas Markert in Supp. of Def.'s Mot. ("Markert Decl.") (Dkt. No. 20)).  McKeon resides outside of Allentown, Pennsylvania, (McKeon Decl. ¶ 2), and Markert resides in Pennsylvania, (Markert Decl. ¶¶ 5, 9).  Wells Fargo has chosen to omit Markert's actual location in Pennsylvania from its papers, but Plaintiff contends that Markert resides in Philadelphia.  (Pl.'s Opp'n 22.)  The federal courthouse in Scranton, Pennsylvania, and the federal courthouse in White Plains, New York, are approximately equidistant from Philadelphia, Pennsylvania.  Therefore, the burden on Markert is largely irrelevant for purposes of Wells Fargo's Motion.  Moreover, the Court questions whether McKeon's testimony will be relevant to this Action.  McKeon merely states

that he is responsible for "monitoring the condition of the [p]remises and addressing maintenance issues as necessary." (McKeon Decl. ¶ 4.) Nowhere does McKeon declare that he has personal knowledge about the facts giving rise to this litigation. The Court thus finds that Wells Fargo will not suffer any material harm or prejudice by transporting its witnesses to New York for trial. Any harm resulting from litigating this Action in New York may also be lessened by conducting depositions in the witnesses' principal places of business. *See Am. Eagle Outfitters*, 457 F. Supp. 2d at 478 ("Given the likelihood, based on past experience, that the principal expenditure of time in this action will be in the discovery phase, the inconvenience for parties and witnesses can be minimized by a determination that the parties and witnesses will be deposed in their principal place of business . . . .").

Plaintiff, on the other hand, contends that its owner, Israel Gross, resides in Monsey, New York, (Decl. of Israel Gross in Opp'n to Def.'s Mot. ("Gross Decl.") ¶ 4 (Dkt. No. 22)), and two of the witnesses Plaintiff would call at trial reside in Monroe, New York, (Gross Decl. ¶¶ 14, 15). Therefore, this factor weighs against transferring the Action. As best the Court can tell, Wells Fargo intends to call two witnesses at trial, one of which allegedly resides equidistant from White Plains and Scranton, and the other of which has little to no information bearing on the issues to be tried in this case. No matter where the case is tried, a Party or its witnesses will have to travel to court to present its case. Plaintiff, however, has made a stronger showing than Wells Fargo on this factor because its witnesses appear to have information relevant to the issues to be tried and they do not live equidistant between the two relevant forums.

## 2. Convenience of the Parties

Plaintiff is a Pennsylvania corporation and it maintains offices in Scranton, Pennsylvania. (Compl. ¶ 6.) Wells Fargo is a national banking association with its principal place of business

located in Sioux Falls, South Dakota.  (*Id.* ¶ 7.)  The Court finds that this factor is neutral

because the Party residing in Pennsylvania filed suit in New York and Wells Fargo has not

explained how it will be disadvantaged or harmed by litigating this Action in New York.

### 3.  Location of Relevant Documents

This factor is neutral.  "The location of documents and records is not a compelling

consideration when records are easily portable."  *Am. Eagle Outfitters*, 457 F. Supp. 2d at 478

(internal quotation marks omitted).  More importantly, none of the relevant documents are even

located in Scranton.  They are located in Markert's office—in Philadelphia—on Wells Fargo's

electronic document system, or in Charlotte, North Carolina.  (*See* Markert Decl. ¶ 9.)

### 4.  The Locus of Operative Facts

Wells Fargo contends that no connection exists between the operative facts of this Action

and New York.  (Def.'s Mem. 20.)  "The location of the operative events is a primary factor in

determining a § 1404(a) motion to transfer.  It substantially favors transfer from this district

where a party has not shown that any of the operative facts arose in the Southern District of New

York."  *Everlast World's Boxing Headquarters*, 928 F. Supp. 2d at 745 (citation and internal

quotation marks omitted).  "In a contract case, the locus of operative facts is determined by the

location where the contract was negotiated or executed, where the contract was to be performed,

and where the alleged breach occurred."  *Id.*

The contract at issue in this litigation—the Lease Agreement—was to be performed in

Pennsylvania, and the alleged breach—Wells Fargo's failure to pay rent—occurred in Scranton,

Pennsylvania.  But relevant events nonetheless occurred in New York because the Termination

Notice was sent to Monroe, New York, (*see* Termination Notice), and Plaintiff represents that

any acts or omissions by Plaintiff concerning a waiver of strict compliance with the Lease

29

Agreement's terms would have happened in New York as well, (Gross Decl. ¶ 13).  Wells Fargo argues that the location of Plaintiff's acts or omissions is irrelevant because the Building is located in Scranton, Pennsylvania, (Def.'s Supplemental Mem. 5), but the Court disagrees with this assessment.  The location of the Building has little relevance to the issues raised by this Action.  Indeed, Wells Fargo has not cited a single event that occurred in Scranton that relates to Plaintiff's waiver of strict compliance with the Lease Agreement's termination provisions.  Of course, many of the facts relevant to this Action occurred in *Pennsylvania*, but those facts do not necessitate the transfer of this case to Scranton.

On balance, this factor weighs in favor of transferring the case to the Middle District of Pennsylvania, but only slightly.

### 5.  The Availability of Process to Compel the Attendance of Unwilling Witnesses

Wells Fargo argues that the Middle District of Pennsylvania can more easily compel unwilling, non-party witnesses to appear for depositions and trial.  (Def.'s Mem. 21.)  This factor is neutral because Wells Fargo has failed to substantiate its argument "by pointing to any specific witness to suggest that trial in New York would impede the attendance of any of their contemplated witnesses."  *Am. Eagle Outfitters*, 457 F. Supp. 2d at 478–79; *see also id.* at 479 ("Having failed to identify any particular unwilling witnesses who might be more available in California than in New York, the [d]efendants have failed to establish that this factor weighs in their favor.").

### 6.  Relative Means of the Parties

"This factor is not entitled to great weight where [the] plaintiff and [the] defendant are both corporations."  *Id.* at 478 (internal quotation marks omitted).  "[A] party arguing for or against a transfer because of inadequate means must offer documentation to show that transfer

(or lack thereof) would be unduly burdensome to his finances." *Id.* (internal quotation marks omitted).  Neither Party has made such a submission.  Therefore, this factor is neutral.

### 7.  The Forum's Familiarity with the Governing Law

"In general, this factor is one of the least important factors in determining a motion to transfer, especially where no complex questions of foreign law are involved." *Everlast World's Boxing Headquarters*, 928 F. Supp. 2d at 747 (internal quotation marks omitted).  Neither Party disputes that Pennsylvania law governs Plaintiff's breach of contract claim, but Wells Fargo has not identified any complex question of law that would prohibit the Court from keeping this Action.  Indeed, Wells Fargo concedes that the "Court has the capacity to interpret and apply Pennsylvania contract law."  (Def.'s Mem. 22.)  Accordingly, this factor is neutral.

### 8.  The Weight Accorded to Plaintiff's Choice of Forum

"[A] plaintiff's choice of forum is accorded considerable weight in the § 1404(a) balancing test," but a plaintiff's choice merits "less deference where the connection between the case and the chosen forum is minimal." *Everlast World's Boxing Headquarters*, 928 F. Supp. 2d at 748 (internal quotation marks omitted).  Plaintiff is a Pennsylvania corporation, and the Building is located in Scranton, Pennsylvania, but New York does have a connection to this litigation: Any acts constituting waiver of strict compliance with the Lease Agreement's waiver provisions likely occurred in New York.  Thus, while Plaintiff's choice of forum is not controlling, it must be given some deference.

### 9.  Trial Efficiency and the Interests of Justice

"This factor relates primarily to issues of judicial economy," and focuses on the "totality of the circumstances." *Mitsui Marine & Fire Ins. Co. Ltd. v. Nankai Travel Int'l Co.*, 245 F.

Supp. 2d 523, 527 (S.D.N.Y. 2003) (internal quotation marks omitted). This factor is neutral. Neither Party will be materially disadvantaged by litigating this Action in New York.

### 10. Balancing of the Factors

In sum, factors two, three, five, six, seven, and nine are neutral. The first factor, convenience to the witnesses, and the eighth factor, the weight accorded to Plaintiff's choice of forum, weigh against transferring the case. However, the fourth factor, the locus of operative facts, weighs in favor of transferring the case. Based on this distribution, Wells Fargo has failed to make a "clear and convincing" showing that the case should be litigated in the Middle District of Pennsylvania. *See Atl. Recording*, 603 F. Supp. 2d at 695 (internal quotation marks omitted). The Action is certainly connected to Scranton, Pennsylvania, because that is where the Building is located, but Wells Fargo has not identified a single relevant witness or document actually located in Scranton. It appears that much of Wells Fargo's evidence resides in Philadelphia, Pennsylvania, but Philadelphia is equidistant between White Plains and Scranton. Accordingly, Wells Fargo's Motion To Transfer the case is denied.

### III. Conclusion

For the foregoing reasons, Wells Fargo's Motion is denied. Wells Fargo shall file an Answer to the Complaint within 30 days from the date of this Opinion. The Clerk of Court is respectfully directed to terminate the pending Motion. (Dkt. No. 18.)

SO ORDERED.

DATED:      March 29, 2017
            White Plains, New York

                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE

32